# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MATTHEW SCIABACUCCHI,      )
Individually and on Behalf of All Others      )
Similarly Situated,      )
     )
         Plaintiff,      )
     )
       v.      ) C.A. No. 11418-VCG
     )
LIBERTY BROADBAND      )
CORPORATION, JOHN MALONE,      )
GREGORY MAFFEI, MICHAEL      )
HUSEBY, BALAN NAIR, ERIC      )
ZINTERHOFER, CRAIG JACOBSON,      )
THOMAS RUTLEDGE, DAVID      )
MERRITT, LANCE CONN, and JOHN      )
MARKLEY,      )
     )
         Defendants,      )
     )
and      )
     )
CHARTER COMMUNICATIONS,      )
INC.,      )
     )
         Nominal Defendant.      )

## <u>MEMORANDUM OPINION</u>

Date Submitted: April 6, 2018
Date Decided: July 26, 2018

Kurt M. Heyman and Melissa N. Donimirski, of HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; OF COUNSEL: Jason M. Leviton and Joel A. Fleming, of BLOCK & LEVITON LLP, Boston, Massachusetts, *Attorneys for Plaintiff*.

Martin S. Lessner, David C. McBride, James M. Yoch, Jr., and Paul J. Loughman, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware;

OF COUNSEL: William Savitt, Anitha Reddy, and David Kirk, of WACHTELL, LIPTON, ROSEN & KATZ, New York, New York, *Attorneys for Defendants Michael Huseby, Balan Nair, Eric Zinterhofer, Craig Jacobson, Thomas Rutledge, David Merritt, Lance Conn, John Markley, and Nominal Defendant Charter Communications, Inc.*

Donald J. Wolfe, Jr., Peter J. Walsh, Jr., Brian C. Ralston, Tyler J. Leavengood, Jaclyn C. Levy, and Aaron R. Sims, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Richard B. Harper, of BAKER BOTTS LLP, New York, New York, *Attorneys for Defendants Liberty Broadband Corporation, John Malone, and Gregory Maffei.*

GLASSCOCK, Vice Chancellor

The Plaintiff here is a stockholder in Charter Communications, Inc., a media company. In 2015, Charter made two major acquisitions, of Bright House Networks and Time Warner Cable. Charter obtained stockholder approval of the transactions, but conditioned the acquisitions on stockholder approval of a related series of transactions, including an issuance of equity to Charter's largest blockholder, Liberty Broadband. The stockholders voting for the acquisitions were told that those acquisitions would not close unless the issuance to Liberty was also approved. The equity issuance would help finance, in small part, the acquisitions. The transactions were approved; the Plaintiff here challenges, among other things, the transfer of equity to Liberty Broadband.

The Defendants moved to dismiss, on the ground that the stockholder vote had cleansed any breaches of duty, citing *Corwin v. KKR Financial Holdings LLC*.[1] By Memorandum Opinion of May 31, 2017, I found that the vote was structured in such a way as to use approval of the lucrative acquisitions to coerce a vote for the issuance and a related transaction, negating any ratifying effect of the vote.[2] The Defendants have also moved to dismiss on two additional grounds. They argue that the claims are solely derivative in nature, and that the Plaintiff has failed to demonstrate that the demand requirement of Court of Chancery Rule 23.1

---

[1] 125 A.3d 304 (Del. 2015).
[2] *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *20–24 (Del. Ch. May 31, 2017).

should be excused.  They also argue that the Complaint fails to state a claim under Court of Chancery Rule 12(b)(6).

The Plaintiff has attempted to plead both derivative and direct claims.  I agree with the Defendants that the claims, in reality, are purely derivative.  Therefore, the direct claims are dismissed.  I also find, however, that the Plaintiff has adequately pled facts sufficient to excuse demand on the Charter board as futile, and that the Complaint adequately pleads a claim sufficient to invoke entire fairness.  The Motion to Dismiss the derivative claims is denied, therefore.  My reasoning follows.

## I. BACKGROUND[3]

The allegations of the Complaint are recounted in great detail in my initial motion-to-dismiss opinion.[4]  I do not duplicate that effort here.  Instead, I include only those facts necessary to understand the issues that remain following my initial decision.

*A. Parties*

Defendant Liberty Broadband Corporation is a Delaware corporation headquartered in Englewood, Colorado.[5]  Liberty Broadband was once a wholly owned subsidiary of non-party Liberty Media Corporation, but Liberty Broadband

---

[3] The facts, drawn from the Complaint and other material I may consider on a motion to dismiss, are presumed true for purposes of evaluating the Defendants' Motions to Dismiss.
[4] *Liberty Broadband Corp.*, 2017 WL 2352152, at *4–13.
[5] Compl. ¶ 12.

was spun-off in 2014, and now both Liberty Broadband and Liberty Media are separate, publicly traded companies.[6] Defendant John Malone owns approximately 47% of the voting power of both Liberty Media and Liberty Broadband.[7] Malone also chairs the boards of directors of both companies.[8] I refer to Malone and Liberty Broadband as the "Stockholder Defendants."

Nominal Defendant Charter Communications, Inc. is a Delaware corporation headquartered in Stamford, Connecticut.[9] Charter is one of the largest cable providers in the United States.[10] Liberty Broadband is Charter's largest stockholder, holding approximately 26% of its stock.[11]

Charter's board of directors consists of ten members, four of whom were designated by Liberty Broadband.[12] The directors are Defendants John Malone, W. Lance Conn, Michael Huseby, Craig Jacobson, Gregory Maffei, John Markley, Jr., David Merritt, Balan Nair, Thomas Rutledge, and Eric Zinterhofer (the "Director Defendants").[13] Liberty Broadband's four designees are Malone, Huseby, Maffei, and Nair.[14]

---

[6] *Id.*
[7] *Id.*
[8] *Id.* ¶ 13.
[9] *Id.* ¶ 24.
[10] *Id.*
[11] *Id.* ¶ 2.
[12] *Id.* ¶¶ 13–22, 34.
[13] *Id.* ¶¶ 13–22.
[14] *Id.* ¶¶ 13, 15, 17, 20.

3

Plaintiff Matthew Sciabacucchi held Charter stock at the time of the challenged transactions, and he maintains his ownership interest today.[15]

*B. Factual Background*

1. Liberty Media Invests in Charter

In May 2013, Liberty Media purchased a 27% stake in Charter.[16] As part of its investment, Liberty Media entered into a stockholders agreement with Charter.[17] That agreement gave Liberty Media the right to designate four directors to the Charter board so long as its ownership interest remained at 20% or higher.[18] The agreement also imposed several restrictions on Liberty Media: it could not acquire over 35% of Charter's voting stock before January 2016 (or more than 39.99% after January 2016), and it was prohibited from soliciting proxies or consents.[19] Liberty Media's four board designees were, as just noted, Malone, Maffei, Nair, and Huseby.[20] In September 2014, Liberty Media assigned all of its rights and obligations under the stockholders agreement to Liberty Broadband, one of the Defendants in this action.[21]

Several years before Liberty Media's investment, Charter had adopted provisions in its certificate of incorporation that restricted the company's ability to

---

[15] *Id.* ¶ 11.
[16] *Id.* ¶ 32.
[17] *Id.* ¶ 33.
[18] *Id.* ¶ 34.
[19] *Id.* ¶ 35.
[20] *Id.* ¶ 33.
[21] *Id.* ¶ 37.

enter into transactions with large stockholders.[22]  Specifically, the certificate of incorporation put restrictions on "Business Combinations" between Charter and an "Interested Stockholder."[23]  An "Interested Stockholder" was defined as any person who held 10% or more of Charter's voting stock, and "Business Combination" was defined to include transfers of Charter assets (and issuances of Charter securities) to an Interested Stockholder.[24]  Charter could not effect a Business Combination unless (i) a majority of the directors unaffiliated with the Interested Stockholder approved the transaction, and (ii) a majority of stockholders unaffiliated with the Interested Stockholder voted in favor of the transaction.[25]

    2. The Challenged Transactions

    a. The Original Bright House Transaction

Soon after Liberty Media invested in Charter, Rutledge (Charter's CEO) and Maffei met with executives of Time Warner Cable Inc. to discuss a potential acquisition of Time Warner.[26]  The discussions continued into late 2013 and early 2014, but they broke down in February 2014.[27]  That month, Comcast Corporation and Time Warner announced that Comcast had agreed to acquire Time Warner for

---

[22] Yoch Aff. Ex. A, Ex. 3.1, art. 8(a).
[23] *Id.*
[24] *Id.* art. 8(b)(i)(B), 8(b)(vi).
[25] *Id.* art. 8(a), 8(b)(v).
[26] Compl. ¶ 63.
[27] *Id.* ¶ 64.

5

approximately $45 billion.[28]   Anticipating antitrust challenges to the merger, Comcast and Time Warner decided to divest a number of subscribers.[29]   As part of that divestment, Charter would enter into subscriber swaps with Comcast and Time Warner, in addition to purchasing a Comcast subsidiary.[30]   These transactions were contingent on the consummation of the Comcast-Time Warner merger.[31]

Meanwhile, having failed to acquire Time Warner, Charter set its sights on Bright House Networks, LLC, a large cable company owned by Advance/Newhouse Partnership.[32]   In June 2014, Advance/Newhouse sent Charter a high-level term sheet under which Advance/Newhouse would contribute Bright House to a partnership in exchange for, among other things, $1 billion in cash and common and preferred partnership units.[33]   One week later, Charter proposed revisions related to Advance/Newhouse's influence over Charter, "particularly in conjunction with the existing share ownership and governance rights of Liberty Media Corporation."[34]   Negotiations continued, and by October 2014, Charter and Advance/Newhouse had reached agreement on a term sheet setting forth the material terms of the transaction.[35]   The parties shared the term sheet with Liberty

---

[28] *Id.* ¶ 65.
[29] *Id.*
[30] *Id.* ¶ 66.
[31] *Id.*
[32] *Id.* ¶ 68.
[33] Yoch Aff. Ex. D, at 137.
[34] Compl. ¶ 91 (emphasis omitted).
[35] Yoch Aff. Ex. D, at 138.

Media, which proposed various changes, including that Advance/Newhouse "grant Liberty Media a proxy . . . to vote as many of [Advance/Newhouse's] shares in Charter as would be required to increase Liberty Media's total voting stake in Charter to 25.01%."[36] Liberty Media also proposed that Charter give it "preemptive rights to maintain its pro rata ownership stake in Charter after the closing of the combination with Bright House in connection with any issuance of equity securities of Charter after signing."[37]

On October 24, the six Charter directors not appointed by Liberty Media met to discuss the term sheet.[38] The directors reviewed the potential conflicts of interest of Charter's legal and financial advisors, as well as the directors present at the meeting.[39] "The independent directors resolved to form a working group comprising Eric L. Zinterhofer, Chairman of Charter, John D. Markley Jr. and Lance Conn to meet as necessary to consider and negotiate the potential transaction."[40] Because LionTree Advisors LLC, one of Charter's financial advisors, had "a substantial historic and ongoing relationship with Liberty," "the independent directors of the Charter board of directors negotiated and considered the transactions with Liberty without the participation of LionTree."[41]

---

[36] *Id.*
[37] *Id.* at 138–39.
[38] *Id.* at 139.
[39] *Id.*
[40] *Id.*
[41] *Id.*

Following several weeks of negotiations, on November 21, Charter and Liberty Broadband (which had recently completed its spin-off from Liberty Media) agreed to pursue the Bright House acquisition based on a revised term sheet that (i) gave Liberty Broadband the right to maintain a 25.01% voting interest in Charter, and (ii) provided for a thirteen-member board with three designees each for Liberty Broadband and Advance/Newhouse.[42] The purpose of maintaining a 25.01% voting interest in Charter was to allow Liberty Broadband to escape regulation under the Investment Company Act of 1940, which does not apply to entities "primarily engaged . . . in a business or businesses other than that of investing, reinvesting, owning, holding, or trading in securities."[43]

On March 30, 2015, the Charter board met to consider the proposed transactions.[44] After discussing the benefits of the deal, the four directors designated by Liberty Broadband voted to approve the acquisition.[45] Those directors (along with representatives of LionTree) then left the meeting.[46] The remaining six directors proceeded to review the proposed transactions between Charter and Liberty Broadband.[47] The remaining directors determined that the

---

[42] *Id.*
[43] 15 U.S.C. § 80a-3(b)(1).
[44] Yoch Aff. Ex. D, at 141.
[45] *Id.*
[46] *Id.*
[47] *Id.*

contemplated transactions were fair to and in the best interests of Charter's stockholders.[48]

Charter announced the Bright House transaction the next day.[49] Under the agreement, Charter would pay Advance/Newhouse $2 billion in cash, $5.9 billion in exchangeable common partnership units, and $2.5 billion in convertible preferred partnership units.[50] The partnership units would be exchangeable into Charter common stock at $173 per share, which represented the sixty-day Charter volume-weighted average price.[51] Under a new stockholders agreement between Charter, Liberty Broadband, and Advance/Newhouse, Advance/Newhouse would retain a 26.3% ownership stake in the resulting company, and Liberty Broadband would hold a 19.4% ownership stake.[52] Advance/Newhouse also agreed to grant Liberty Broadband a voting proxy on up to 6% of its shares, giving Liberty Broadband voting power of at least 25.01% at closing.[53] Moreover, both Advance/Newhouse and Liberty Broadband would receive preemptive rights allowing them to maintain their pro rata ownership.[54] Finally, Liberty Broadband agreed to purchase $700 million of newly issued Charter shares at $173 per share.[55]

---

[48] *Id.*
[49] Compl. ¶ 69.
[50] *Id.*
[51] *Id.*
[52] *Id.* ¶ 70.
[53] *Id.*
[54] *Id.*
[55] *Id.*

9

The Bright House acquisition was contingent on the consummation of the subscriber-divestment transactions Charter had entered into with Time Warner and Comcast.[56]  The divestment transactions, in turn, would not close unless Comcast merged with Time Warner.[57]  In April 2015, the Comcast/Time Warner merger was terminated following reports that the Federal Communications Commission would bring a lawsuit to block the deal.[58]  Thus, the divestment transactions and the Bright House deal became void.[59]

> b. The Time Warner Merger, and the New Bright House Transaction

The same day Comcast and Time Warner called off the proposed merger, Charter and Time Warner began discussing a potential combination.[60]  Rutledge, Charter's CEO, spoke with Maffei about Charter's interest in a merger with Time Warner, and Maffei indicated his support for such a transaction.[61]  Maffei also said that Liberty Broadband was interested in pursuing "a significant additional investment in Charter, including by exchanging its [Time Warner] shares for Charter shares, . . . in light of Charter's potential financing needs and Liberty Broadband's desire to maintain its percentage equity interest in Charter."[62]

---

[56] Compl. ¶ 69.
[57] *Id.* ¶ 66.
[58] *Id.* ¶ 74.
[59] *Id.*
[60] Yoch Aff. Ex. D, at 143.
[61] *Id.*
[62] *Id.*

Charter's board met on May 4, 2015, to discuss the potential acquisition of Time Warner.[63] The board authorized Charter's management to offer to acquire Time Warner for approximately $172.50 per Time Warner share based on Charter's stock price as of May 4.[64] The board also reaffirmed its willingness to "complete the Bright House transaction on substantially the same economic and governance terms as previously agreed."[65] About two weeks later, Charter and Time Warner management discussed the "terms on which Liberty Broadband was interested in making an additional investment in Charter shares to partially finance the cash portion of the consideration to be paid to [Time Warner] stockholders and the terms on which Liberty Broadband would consider exchanging [Time Warner] shares for Charter shares."[66] The next day, "the independent directors of Charter's board of directors met to receive an update from Mr. Zinterhofer and Wachtell Lipton[, Charter's legal advisors,] regarding the Liberty Broadband investment, including the ongoing discussions regarding the aggregate amount of the investment and the per share price."[67]

On May 26, 2015, Charter announced that it had reached an agreement to merge with Time Warner for a mix of stock and cash.[68] The merger valued Time

---

[63] *Id.* at 144.
[64] *Id.*
[65] *Id.*
[66] *Id.* at 147.
[67] *Id.*
[68] Compl ¶ 75.

Warner at approximately $78.7 billion.[69] Charter agreed to provide $100 in cash and shares equivalent to 0.5409 Charter shares for each outstanding Time Warner share in a newly created public parent company, New Charter.[70] Liberty Broadband and Liberty Interactive would receive all stock for their Time Warner shares.[71] Charter also provided "an election option for each Time Warner Cable stockholder, other than Liberty Broadband . . . or Liberty Interactive . . . to receive $115.00 of cash and New Charter shares equivalent to 0.4562 shares" of Charter for each Time Warner share.[72] Upon the closing of the merger, Liberty Broadband agreed to buy $4.3 billion of newly issued shares of New Charter at $176.95, the closing price of Charter as of May 20, 2015.[73]

At the same time that Charter announced the Time Warner merger, it announced a new Bright House transaction with similar terms as the original Bright House transaction.[74] Once again, pursuant to a new stockholders agreement between Charter, Liberty Broadband, and Advance/Newhouse, Advance/Newhouse agreed to grant Liberty Broadband a voting proxy on up to 6% of its shares.[75] Liberty Broadband also agreed to purchase $700 million of newly

---

[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*
[73] *Id.* ¶¶ 79, 81.
[74] *Id.* ¶ 77.
[75] *Id.* ¶ 83.

12

issued Charter shares at the previously agreed-to price of $173 per share.[76]  Liberty Broadband received the right to "purchase from any issuance of equity in conjunction with capital raising efforts sufficient shares to maintain its investment in the Company," and was carved out from any future stockholders rights plan Charter might adopt.[77]  The Time Warner merger and the Bright House transaction were conditioned on the Charter stockholders' approving (i) the stock issuances to Liberty Broadband and (ii) the voting proxy agreement.[78]

All of these transactions had been approved at a Charter board meeting held on May 23.[79]  At that meeting, the four directors designated by Liberty Broadband first unanimously approved the proposed transactions with Time Warner and Advance/Newhouse as fair and in the best interests of Charter's stockholders.[80] They then left the meeting.[81]  The remaining six directors proceeded to review the negotiations over the agreements with Liberty Broadband and Bright House.[82] "After further consideration and consultation with their advisors," the remaining directors unanimously approved the Time Warner merger and the transactions with Liberty Broadband and Bright House.[83]

---

[76] *Id.* ¶ 79.
[77] *Id.* ¶ 84.
[78] *Id.* ¶ 99.
[79] Yoch Aff. Ex. D, at 151–52.
[80] *Id.* at 152.
[81] *Id.*
[82] *Id.*
[83] *Id.*

On August 20, 2015, Charter filed a definitive proxy statement with the Securities and Exchange Commission in connection with the Time Warner merger and the agreements with Bright House and Advance/Newhouse.[84] On September 21, 2015, 90% of outstanding Charter shares approved the Time Warner merger.[85] Excluding shares beneficially owned by Liberty Broadband and its affiliates, approximately 86% of outstanding Charter shares, in a single vote, voted in favor of issuing stock to Liberty Broadband, allowing Liberty Broadband and Liberty Interactive to receive all stock for their Time Warner shares, and granting Liberty Broadband a voting proxy on up to 6% of Advance/Newhouse's shares.[86] The Time Warner merger and the Bright House transaction closed on May 18, 2016.

Before the transactions just described, Charter, Time Warner, and Bright House were separate entities. Bright House was wholly owned by Advance/Newhouse. Liberty Broadband owned 26% of Charter. After the transactions, Charter owned Bright House and had merged with Time Warner. Time Warner stockholders owned between 40% and 44% of Charter, Advance/Newhouse owned between 13% and 14%, and Liberty Broadband owned between 19% and 20%. As a result of its voting proxy, however, Liberty

---

[84] Yoch Aff. Ex. D.
[85] Yoch Aff. Ex. F.
[86] *Id.*

14

Broadband retained an additional voting interest of approximately 6%, keeping its total voting power about the same as it stood before the transactions.

\* \* \*

To recap, the Plaintiff does not challenge the Time Warner merger or the Bright House acquisition. Instead, he attacks four "side deals" Charter entered into with Liberty Broadband in connection with the Time Warner and Bright House transactions.[87] First, the Plaintiff challenges Charter's issuance of $700 million in stock to Liberty Broadband as part of the Bright House acquisition. According to the Plaintiff, that issuance was unfair because it was priced at $173 per share, which represented a discount to Charter's market price at the time.[88] Second, the Plaintiff questions the fairness of Charter's decision to issue Liberty Broadband $4.3 billion in stock valued at $176.95 per share, an issuance made in connection with the Time Warner merger. In the Plaintiff's view, that transaction was unfair because, while $176.95 represented Charter's market price at the time, that price failed to take account of financial projections suggesting that the company would be worth far more than $176.95 per share once the transactions closed.[89]

Third, the Plaintiff challenges Charter's decision to allow only Liberty Broadband to receive all stock for its Time Warner shares. That decision

---

[87] Compl. ¶ 99.
[88] *Id.* ¶ 6.
[89] *Id.* ¶ 7 & n.3.

purportedly gave Liberty Broadband "a tax benefit not available to public stockholders" and enabled it to "fully enjoy the future benefits and synergies of the [t]ransactions."[90] Fourth and finally, the Plaintiff attacks Liberty Broadband's receipt of the 6% voting proxy, which allowed it to maintain its preexisting voting power. As a result, Liberty Broadband was "the only shareholder to avoid significant dilution of its voting interest upon the consummation of the [t]ransactions."[91]

*C. This Litigation*

One day after Charter filed the proxy, the Plaintiff filed his original complaint for breach of fiduciary duties, alleging that the proxy was materially misleading because it failed to disclose certain unlevered free cash flow projections and the text of the voting proxy agreement. The Plaintiff sought to enjoin the acquisitions based on these purported breaches. Charter supplemented the proxy on September 9, 2015, providing the requested projections and the text of the voting proxy agreement. The Plaintiff then withdrew his request for injunctive relief, acknowledging that "the additional disclosures . . . moot[ed] Plaintiff's pending motions."[92]

---

[90] *Id.* ¶ 9.
[91] *Id.* ¶ 8.
[92] Sept. 10, 2015 Letter to the Court.

The Plaintiff amended his complaint on April 22, 2016. The Complaint contains four counts. Count I is brought as a direct claim; it alleges that the Director Defendants breached their fiduciary duties by (i) approving the stock issuances to Liberty Broadband and the voting proxy agreement, and (ii) "failing to disclose all material facts necessary for shareholders to cast an informed vote on . . . whether to enter into the [t]ransactions and issue the shares contemplated thereunder."[93] The Plaintiff claims that the stock issuances and the voting proxy agreement "unfairly expropriate[d] and transfer[red] voting and economic power from Charter's public shareholders to the Stockholder Defendants."[94] Like Count I, Count II is brought as a direct claim, and it alleges that the Stockholder Defendants, as Charter's controlling stockholders, breached their fiduciary duties by causing the Charter board to approve the transactions challenged in Count I.[95] Counts III and IV mirror Counts I and II, except that they are brought derivatively rather than directly.[96]

On July 22, 2016, the Defendants moved to dismiss the Complaint under Court of Chancery Rules 12(b)(6) and 23.1. On May 31, 2017, I issued a Memorandum Opinion holding that (i) the Stockholder Defendants were not controlling stockholders, and (ii) any purported breaches of fiduciary duty were not

---

[93] Compl. ¶¶ 157–60.
[94] *Id.* ¶ 159.
[95] *Id.* ¶¶ 161–64.
[96] *Id.* ¶¶ 165–72.

cleansed by the stockholder vote, because the Complaint adequately alleged that the vote was structurally coerced.[97] Specifically, I held that the contractual restrictions imposed on the Stockholder Defendants—for example, Liberty Broadband could not acquire over 35% of Charter's stock, designate more than four out of ten directors, or solicit proxies or consents—defeated any inference that the Stockholder Defendants were controlling stockholders.[98] I then held that the Complaint supported a reasonable inference that the stockholder vote in favor of the challenged transactions was coerced.[99] The coercion stemmed from the way the transactions were presented to the stockholders. The Bright House acquisition and the Time Warner merger—neither of which the Plaintiff challenges—were contingent on stockholder approval of the challenged transactions, that is, the share issuances to Liberty Broadband and the voting proxy agreement. Thus, the Charter board allegedly "presented the stockholders with a simple choice: accept (disloyal) equity issuances to the [c]ompany's largest stockholder, and an agreement granting that stockholder greater voting power, or lose two beneficial transactions."[100] That, in my view, prevented the stockholder vote from having ratifying effect at the pleading stage.[101]

---

[97] *Liberty Broadband Corp.*, 2017 WL 2352152, at *14–24.
[98] *Id.* at *16–20.
[99] *Id.* at *20–24.
[100] *Id.* at *22.
[101] *Id.* at *24.

18

Having found that the stockholder vote did not cleanse any purported breaches of fiduciary duty at the motion-to-dismiss stage, I then requested supplemental briefing on whether the Plaintiff's claims are direct or derivative.[102] The parties provided that briefing, and I heard oral argument on the remaining issues on April 6, 2018. The Plaintiff concedes in supplemental briefing that Counts II and IV, which rest on the allegation that the Stockholder Defendants controlled Charter, must be dismissed in light of my holding that the Complaint fails to adequately allege those Defendants' controller status. Thus, this Memorandum Opinion considers only whether Counts I and III state viable claims for relief.

## II. ANALYSIS

The Complaint alleges that the following four transactions "unfairly expropriate[d] and transfer[red] voting and economic power from Charter's public shareholders to the Stockholder Defendants": (i) Charter's issuance of $700 million in Charter shares to Liberty Broadband at $173 per share, (ii) Liberty Broadband's receipt of a voting proxy from Advance/Newhouse to vote up to 6% of its shares, (iii) Charter's issuance of $4.3 billion in Charter shares to Liberty Broadband at $176.95 per share, and (iv) Liberty Broadband's receipt of all

---

[102] *Id.*

19

Charter stock for its Time Warner shares.[103]  The threshold question is whether these allegedly unfair transactions give rise to purely derivative claims.  I turn to that question now.

### A. The Plaintiff's Claims Are Solely Derivative

"To determine whether a claim is derivative or direct, this Court must consider '(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'"[104]  To plead a direct claim, "[t]he stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[105]  By contrast, "[w]here all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."[106]  *Tooley* requires this Court to look beyond the labels used to describe the claim, evaluating instead the nature of the wrong alleged.[107]

"In the typical corporate overpayment case, a claim against the corporation's fiduciaries for redress is regarded as exclusively derivative, irrespective of whether

---

[103] Compl. ¶ 159.
[104] *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 655 (Del. Ch. 2013) (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)).
[105] *Tooley*, 845 A.2d at 1039.
[106] *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008).
[107] *E.g.*, *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 817 (Del. Ch. 2005), *aff'd*, 906 A.2d 766 (Del. 2006).

20

the currency or form of overpayment is cash or the corporation's stock."[108]  The

reason is that, in the typical corporate overpayment case, "any dilution in value of

the corporation's stock is merely the unavoidable result (from an accounting

standpoint) of the reduction in the value of the entire corporate entity, of which

each share of equity represents an equal fraction."[109]  In *Gentile*, however, the

Supreme Court pointed to "at least one transactional paradigm—a species of

corporate overpayment claim—that Delaware case law recognizes as being both

derivative and direct in character."[110]  *Gentile* held that a corporate overpayment

claim may be both direct and derivative where:

> (1) a stockholder having majority or effective control causes the
> corporation to issue "excessive" shares of its stock in exchange for
> assets of the controlling stockholder that have a lesser value; and (2)
> the exchange causes an increase in the percentage of the outstanding
> shares owned by the controlling stockholder, and a corresponding
> decrease in the share percentage owned by the public (minority)
> shareholders.[111]

Post-*Gentile*, Delaware courts have struggled to define the boundaries of

dual-natured claims.[112]  In *Feldman*, this Court took a limited view of *Gentile*'s

reach, finding it "clear" "that the Delaware Supreme Court intended to confine the

scope of its rulings to only those situations where a controlling stockholder

---

[108] *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006).
[109] *Id.*
[110] *Id.*
[111] *Id.* at 100.
[112] *See Chester Cty. Emps.' Ret. Fund v. New Residential Inv. Corp.*, 2016 WL 5865004, at *7 (Del. Ch. Oct. 7, 2016) ("There is some tension in recent cases about how far to extend *Gentile*."), *aff'd*, 2018 WL 2146483 (Del. May 10, 2018).

exists."[113]  *Feldman* reasoned that "any other interpretation would swallow the general rule that equity dilution claims are solely derivative, and would cast great doubt on the continuing vitality of the *Tooley* framework."[114]  Thus, under *Feldman*, a dual-natured claim arises only where "a controlling stockholder, with sufficient power to manipulate the corporate processes, engineers a dilutive transaction whereby that stockholder receives an exclusive benefit of increased equity ownership and voting power for inadequate consideration."[115]

Other decisions have taken a more expansive view of *Gentile*.  In *Carsanaro*, this Court held that a dual-natured claim does not require the presence of a controlling stockholder on both sides of the transaction.[116] According to *Carsanaro*, *Gentile* also applies to self-interested stock issuances effectuated by a board that lacks a disinterested and independent majority.[117]  In *In re Nine Systems Corp. Shareholders Litigation*, Vice Chancellor Noble agreed with *Carsanaro*'s approach, reasoning that it made little sense "to hold a controlling stockholder to a higher standard than the board of directors."[118]  Vice Chancellor Noble also emphasized that *Gentile* "expressly recognized that it only addressed what was '*at least one* transactional paradigm' that had the dual nature of causing direct and

---

[113] *Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007), *aff'd*, 951 A.2d 727.
[114] *Id.*
[115] *Id.*
[116] 65 A.3d at 658.
[117] *Id.*
[118] 2014 WL 4383127, at *28 (Del. Ch. Sept. 4, 2014), *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Table) (Del. 2015).

derivative harm and permitting direct and derivative recovery."[119]  Accordingly, any "[b]roader language in *Gentile* . . . about situations not involving a controlling stockholder would arguably have been dictum."[120]

The Supreme Court revisited *Gentile* in *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*.[121]  *El Paso* involved a limited partner's claim that the partnership had overpaid the controlling general partner for assets held by the general partner's parent.[122]  The limited partner did not attempt to prove that the overpayment increased the general partner's voting power at the expense of the unaffiliated unitholders.[123]  Instead, the injury stemmed solely from "the extraction of . . . economic value from the minority by a controlling stockholder."[124]  Nevertheless, the limited partner argued that his challenge to the overpayment gave rise to a dual-natured claim under *Gentile*.[125]  The Supreme Court rejected the limited partner's attempt to fit his claim into the *Gentile* framework.[126]

The Supreme Court emphasized that *Gentile* involved "a controlling shareholder and transactions that resulted in an improper transfer of both economic value *and* voting power from the minority stockholders to the controlling

---

[119] *Id.* at *27 (quoting *Gentile*, 906 A.2d at 99).
[120] *Id.*
[121] 152 A.3d 1248 (Del. 2016).
[122] *Id.* at 1252–53.
[123] *Id.* at 1264.
[124] *Id.*
[125] *Id.*
[126] *Id.*

23

stockholder."[127]  Because the challenged transactions in *El Paso* did not dilute the unitholders' voting rights, the limited partner's claim failed to "satisfy the *unique circumstances* presented by the *Gentile* 'species of corporate overpayment claim[s].'"[128]  The limited partner conceded that he had proved only expropriation of economic value, and not any dilution of voting rights.[129]  According to the limited partner, however, this distinction was "immaterial."[130]  The Supreme Court disagreed.[131]  It expressly "decline[d] the invitation to further expand the universe of claims that can be asserted 'dually' to hold here that the extraction of solely economic value from the minority by a controlling stockholder constitutes direct injury."[132]  Thus, the Supreme Court held that the limited partner's overpayment claim was "exclusively derivative under *Tooley*."[133]

Chief Justice Strine wrote separately in *El Paso* to note that *Gentile* "is difficult to reconcile with traditional doctrine" on the direct/derivative distinction.[134]  As the Chief Justice pointed out, "[a]ll dilution claims involve, by definition, dilution."[135]  Thus,

---

[127] *Id.* at 1263.
[128] *Id.* at 1264 (emphasis added) (quoting *Gentile*, 906 A.2d at 99).
[129] *Id.*
[130] *Id.*
[131] *Id.*
[132] *Id.*
[133] *Id.* at 1265.
[134] *Id.* at 1266 (Strine, C.J., concurring).
[135] *Id.*

> [t]o suggest that, in any situation where other investors have less voting power after a dilutive transaction, a direct claim also exists turns the most traditional type of derivative claim—an argument that the entity got too little value in exchange for shares—into one always able to be prosecuted directly.[136]

The Chief Justice found this result to be problematic.[137]

Following *El Paso*, this Court has had two occasions to consider whether *Gentile* applies in the absence of a controlling stockholder. In *Carr v. New Enterprise Associates, Inc.*, Chancellor Bouchard held that, "to invoke the dual dynamic recognized in *Gentile*, a controlling stockholder must exist *before* the challenged transaction."[138] Because there was no controller at the time of the challenged transaction, the complaint in *Carr* failed to plead facts giving rise to a dual-natured claim.[139] The Chancellor confronted this issue again in *Cirillo Family Trust v. Moezinia*.[140] There, the Court reached the same conclusion, holding that "the *Gentile* paradigm only applies when a stockholder *already possessing majority or effective control* causes the corporation to issue more shares to it for inadequate consideration."[141] As in *Carr*, the *Gentile* framework did not apply in

---

[136] *Id.*
[137] *Id.*
[138] 2018 WL 1472336, at *9 (Del. Ch. Mar. 26, 2018).
[139] *Id.* at *9–10.
[140] 2018 WL 3388398 (Del. Ch. July 11, 2018).
[141] *Id.* at *16.

*Moezinia* because there was no controlling stockholder (or control group) at the corporation before the purportedly improper dilution.[142]

Here, the Plaintiff alleges that Charter overpaid Liberty Broadband by issuing it stock for allegedly unfair consideration. Likewise, the Plaintiff pleads that Charter received inadequate consideration from Liberty Broadband in exchange for agreeing to grant it the 6% voting proxy. These allegations amount to a corporate overpayment claim—Charter purportedly transferred assets to Liberty Broadband for inadequate consideration. Thus, unless the facts alleged in the Complaint fit the *Gentile* paradigm, they give rise only to derivative claims. In my view, *Gentile* does not apply to the challenged transactions, and the Plaintiff's claims are thus solely derivative.

In my initial motion-to-dismiss decision, I held that the Complaint failed to adequately allege that John Malone and Liberty Broadband were Charter's controlling stockholders.[143] That, according to post-*El Paso* caselaw, is dispositive of the direct/derivative question. Because *Gentile* is limited to transactions involving controlling stockholders, the absence of a controller here means that the Plaintiff's claims are not dual-natured.

---

[142] *Id.* In *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, at *26 n.206 (Del. Ch. July 21, 2017), *aff'd*, 184 A.3d 1291 (Table) (Del. 2018), Vice Chancellor Laster went further, writing that "[w]hether *Gentile* is still good law is debatable."

[143] *Liberty Broadband Corp.*, 2017 WL 2352152, at *16–20.

Before *El Paso*, this Court was split on the question whether *Gentile* applied to transactions that did not involve controlling stockholders. *El Paso* clarified this uncertainty by limiting *Gentile* to "the unique circumstances presented" in that case.[144] As the Plaintiff correctly points out, *El Paso* did not squarely address whether *Gentile* is limited to controller transactions. But the Supreme Court in *El Paso* was faced with a similar question: Should *Gentile* be limited to its facts—that is, a transaction that both diluted voting power and expropriated economic value— or should it be extended to a different set of transactions, namely, those that extract only economic value from the minority holders? The Supreme Court answered the question in the negative. It rejected the limited partner's "invitation to further expand the universe of claims that can be asserted 'dually.'"[145]

In my view, the reasoning of *El Paso*, applied here, means that *Gentile* must be limited to its facts, which involved a dilutive stock issuance to a controlling stockholder. *El Paso* thus implicitly rejected the reasoning of decisions such as *Carsanaro* and *Nine Systems*, which had extended *Gentile* to any dilutive issuance approved by a conflicted board. Notably, the two post-*El Paso* decisions to have considered the question have concluded that *Gentile* does not apply absent a controlling stockholder.[146] Because the Complaint here fails to adequately allege

---

[144] *El Paso Pipeline GP Co., L.L.C.*, 152 A.3d at 1264.
[145] *Id.*
[146] *Moezinia*, 2018 WL 3388398, at *16; *Carr*, 2018 WL 1472336, at *9–10.

27

that the Stockholder Defendants controlled Charter, *Gentile* does not apply, and the Plaintiff's claims are solely derivative.[147]

### B. Demand is Excused as to the Challenged Transactions

Because the Plaintiff's challenges to the allegedly unfair transactions give rise to purely derivative claims, the Complaint must comply with Court of Chancery Rule 23.1.[148] The Defendants have moved to dismiss the Complaint for failure to plead demand futility. The demand requirement is an extension of the fundamental principle that "directors, rather than shareholders, manage the business and affairs of the corporation."[149] Directors' control over a corporation embraces the disposition of its assets, including its choses in action. Thus, under Rule 23.1, a derivative plaintiff must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[150]

---

[147] In candor, limiting *Gentile* to controller situations, rather than expanding it to conflicted board non-controller dilution cases, or overruling it entirely, is, as a matter of doctrine, unsatisfying. I find that the Supreme Court's treatment in *El Paso* controls here, however.

[148] Because the Plaintiff's claims are solely derivative rather than dual-natured, I need not decide whether the heightened pleading requirements of Rule 23.1 apply to dual-natured claims brought by stockholders whose ownership stake has not been eliminated by a merger. *See, e.g.*, *Calesa Assocs., L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *9 (Del. Ch. Feb. 29, 2016) (suggesting that "a dual-natured claim should be addressed under the particularized pleading standard of Rule 23.1").

[149] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del. C.* § 141(a)), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[150] Ct. Ch. R. 23.1(a).

Where, as here, the plaintiff has failed to make a presuit demand on the board, the Court must dismiss the complaint "unless it alleges particularized facts showing that demand would have been futile."[151] The plaintiff's "pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)."[152] Under the heightened pleading requirements of Rule 23.1, conclusory "allegations of fact or law not supported by allegations of specific fact may not be taken as true."[153] Nonetheless, the plaintiff is "entitled to all reasonable factual inferences that logically flow from the particularized facts alleged."[154] In deciding a Rule 23.1 motion, I am limited to "the well-pled allegations of the complaint, documents incorporated into the complaint by reference, and judicially noticed facts."[155]

This Court analyzes demand futility under the test set out in *Rales v. Blasband*.[156] *Rales* requires a derivative plaintiff to allege particularized facts raising a reasonable doubt that, if a demand had been made, "the board of directors could have properly exercised its independent and disinterested business judgment

---

[151] *Ryan v. Gursahaney*, 2015 WL 1915911, at *5 (Del. Ch. Apr. 28, 2015), *aff'd*, 128 A.3d 991 (Table) (Del. 2015).

[152] *Brehm*, 746 A.2d at 254.

[153] *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988), *overruled on other grounds by Brehm*, 746 A.2d 244.

[154] *Brehm*, 746 A.2d at 255.

[155] *Breedy-Fryson v. Towne Estates Condo. Owners Ass'n, Inc.*, 2010 WL 718619, at *9 (Del. Ch. Feb. 25, 2010).

[156] 634 A.2d 927 (Del. 1993).

in responding to [it]."[157]  *Aronson v. Lewis* addresses the subset of cases, as here, in which the plaintiff is challenging an action taken by the current board.[158]  To establish demand futility under *Aronson*, the plaintiff must allege particularized facts creating a reasonable doubt that "the directors are disinterested and independent" or the "challenged transaction was otherwise the product of a valid exercise of business judgment."[159]  The tests articulated in *Aronson* and *Rales* are "complementary versions of the same inquiry."[160]  That inquiry asks whether the board is capable of exercising its business judgment in considering a demand.[161]

Here, the Plaintiff argues that demand is futile because at least half of Charter's ten-person board lacks independence from Malone, who is indisputably interested in the challenged transactions.  Delaware law is clear that directors are presumed to be independent for purposes of evaluating demand futility.[162] "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[163]

---

[157] *Id.* at 934.

[158] *See id.* at 933–34 (explaining that *Aronson* does not apply unless the plaintiff is challenging a business decision by the board of directors that would be considering the demand).

[159] 473 A.2d at 814.

[160] *In re China Agritech, Inc. S'holder Derivative Litig.*, 2013 WL 2181514, at *16 (Del. Ch. May 21, 2013); *see also David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006) ("This court has held in the past that the *Rales* test, in reality, folds the two-pronged *Aronson* test into one broader examination.").

[161] *In re Duke Energy Corp. Derivative Litig.*, 2016 WL 4543788, at *14 (Del. Ch. Aug. 31, 2016).

[162] *See Beam v. Stewart*, 845 A.2d 1040, 1055 (Del. 2004) (noting that in "the demand-excusal context, . . . the board is presumed to be independent").

[163] *Aronson*, 473 A.2d at 816.

30

A plaintiff may establish that a director lacks independence by alleging with particularity that the director "is sufficiently loyal to, beholden to, or otherwise influenced by an interested party to undermine the director's ability to judge the matter on its merits."[164]  Put differently, a director is not independent if particularized facts support a reasonable inference that she "would be more willing to risk . . . her reputation than risk the relationship with the interested [person]."[165]

"Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."[166]  Nevertheless, "[s]ome professional or personal friendships, which may border on or even exceed familial loyalty and closeness, may raise a reasonable doubt whether a director can appropriately consider demand."[167]  Likewise, "substantial past or current relationships . . . of a business . . . nature" may, if material to the director, give rise to a pleading-stage inference of beholdenness.[168]  In conducting the independence inquiry, I must "consider all the particularized facts pled by the plaintiff[] about the relationships between the director and the interested party in their totality and not in isolation from each

---

[164] *Frederick Hsu Living Trust v. ODN Holding Corp.*, 2017 WL 1437308, at *26 (Del. Ch. Apr. 14, 2017).

[165] *Beam*, 845 A.2d at 1050.

[166] *Id.*

[167] *Id.*; *see also Del. Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 (Del. 2015) ("Close friendships [lasting fifty years] are likely considered precious by many people, and are rare. People drift apart for many reasons, and when a close relationship endures for that long, a pleading stage inference arises that it is important to the parties.").

[168] *In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 261 n.45 (Del. Ch. 2006).

other."[169]   "Evaluating a board's ability to consider a demand impartially thus requires a 'contextual inquiry.'"[170]

In this case, the relevant board for demand-futility purposes consists of ten individuals: Malone, Conn, Huseby, Jacobson, Maffei, Markley, Merritt, Nair, Rutledge, and Zinterhofer.  The Plaintiff does not challenge the independence of Conn, Markley, or Merritt.  For their part, the Defendants concede that Malone and Maffei lack independence.  Thus, to adequately allege demand futility, the Plaintiff must plead with particularity that at least three of the remaining five directors lack independence from Malone.  In my view, the Plaintiff has cleared this hurdle. Demand is therefore excused.

### 1. Nair

Nair has been a Charter director since May 2013, when he became one of Liberty Media's four designees.[171]  Nair serves as Executive Vice President and Chief Technology Officer of Liberty Global plc.[172]  Malone is the chairman and largest stockholder of Liberty Global, in which he holds a 25% stake.[173]  These allegations raise a reasonable doubt that Nair could impartially consider a demand to sue Malone.

---

[169] *Sanchez*, 124 A.3d at 1019.
[170] *In re EZCORP Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *34 (Del. Ch. Jan. 25, 2016) (quoting *Beam*, 845 A.2d at 1049), *reconsideration granted in part*, 2016 WL 727771 (Del. Ch. Feb. 23, 2016).
[171] Compl. ¶ 20.
[172] *Id.*
[173] *Id.* ¶ 13; Yoch Aff. Ex. B, at I-63.

Delaware law is clear that "when a director is employed by or receives compensation from other entities, and where the interested party who would be adversely affected by purs[u]ing litigation controls or has substantial influence over those entities, a reasonable doubt exists about that director's ability to impartially consider a litigation demand."[174] To establish a lack of independence, a plaintiff need not allege that "the interested party can directly fire a director from his day job."[175] Instead, the question is whether "the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party."[176] Delaware law has also recognized that, "[a]bsent some unusual fact—such as the possession of inherited wealth—the remuneration a person receives from her full-time job is typically of great consequence to her."[177]

*Mizel v. Connelly*[178] illustrates these principles. There, this Court held that two senior executives could not be considered independent of the company's CEO, who also held a 32.7% stake.[179] The Court found it "doubtful" that these two executives could "consider the demand on its merits without also pondering

---

[174] *In re EZCORP Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *36.

[175] *Sanchez*, 124 A.3d at 1023 n.25.

[176] *Id.*

[177] *In re The Student Loan Corp. Derivative Litig.*, 2002 WL 75479, at *3 n.3 (Del. Ch. Jan. 8, 2002).

[178] 1999 WL 550369 (Del. Ch. July 22, 1999).

[179] *Id.* at *1, 3.

33

whether an affirmative vote would endanger their continued employment."[180] Importantly, the Court noted that while "a 32.7% block *may* not be sufficient to constitute control for certain corporation law purposes," "the pragmatic, realist approach dictated by *Rales*" demanded giving "great weight to the practical power wielded by a stockholder controlling such a block."[181] Other courts in this state have reached the same conclusion on similar facts.[182]

Here, while the Complaint does not expressly allege that Nair's positions as Executive Vice President and CTO of Liberty Global constitute his primary employment, that is certainly a reasonable inference. Thus, I infer from the Complaint, Nair works full-time at a company in which Malone is a 25% stockholder. Significantly, Malone is also the chairman of that company's board of directors. The Complaint does not allege that Malone controls Liberty Global, or that he holds a managerial position at the company. Nonetheless, Malone is the company's largest stockholder and chairman, and that puts him "in a position to exert considerable influence over" Nair.[183] Moreover, while the Complaint does not detail Nair's compensation at Liberty Global, that does not negate a pleading-

---

[180] *Id.* at *3.

[181] *Id.* at *3 n.1.

[182] *See, e.g.*, *Rales*, 634 A.2d at 937 (holding that a director who was also the CEO could not act independently of two brothers who held a 44% stake in the company); *Steiner v. Meyerson*, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995) ("The facts alleged appear to raise a reasonable doubt that Wipff, as president, chief operating officer, and chief financial officer, would be unaffected by [the CEO and significant blockholder's] interest in the transactions that plaintiff attacks.").

[183] *Rales*, 634 A.2d at 937.

stage inference of materiality, because the compensation a person receives from her full-time employment is "typically of great consequence to her."[184]  In short, the facts alleged in the Complaint suggest that Nair would be unable to objectively determine whether to initiate litigation against Malone.  Nair thus lacks independence for pleading-stage purposes.

### 2. Rutledge

Rutledge has served as Charter's CEO since February 2012; he has also been a board member since that time.[185]  The Complaint alleges that Rutledge is a full-time Charter employee who depends on the company for his livelihood.[186]  In 2014, Rutledge received $16 million in compensation from Charter.[187]  As noted above, Liberty Broadband controls 26% of the voting stock of Charter, and four of Charter's ten directors are Liberty Broadband appointees.  Malone, in turn, owns 47% of Liberty Broadband.  Notably, Rutledge gave an interview to the *New York Times* in which he "did not deny Malone's influence, stating '[w]hen he talks, I listen. And he is a significant talker.'"[188]  These allegations are sufficient, to my mind, to cast doubt on Rutledge's independence from Malone.

---

[184] *In re The Student Loan Corp. Derivative Litig.*, 2002 WL 75479, at *3 n.3.  Indeed, such compensation is "usually the method by which bills get paid, health insurance is affordably procured, children's educations are funded, and retirement savings are accumulated."  *Id.*
[185] Compl. ¶ 21.
[186] *Id.*
[187] *Id.* ¶ 61.
[188] *Id.* ¶ 88 (alteration in original) (emphasis omitted).

The considerations supporting demand futility with respect to Nair apply with even more significance to Rutledge. While the Complaint does not adequately plead that Malone controls Charter, the facts alleged support a reasonable inference that he exercises substantial influence over the company through his ownership stake in Liberty Broadband. Indeed, Malone serves on the Charter board, and three other directors are designated by Liberty Broadband. Malone's influence over Charter, and Rutledge specifically, is further evidenced by Rutledge's admission that "[w]hen [Malone] talks, I listen. And he is a significant talker."[189] Rutledge is a highly compensated senior executive at Charter. Given that Rutledge presumably receives his primary income from his employment at Charter, "it is doubtful that [he] can consider the demand on its merits without also pondering whether an affirmative vote would endanger [his] continued employment."[190] Thus, like Nair, Rutledge cannot be considered independent from Malone at the pleading stage.

### 3. Zinterhofer

Zinterhofer has served on the Charter board since 2009, and he has been its chairman since December 2009.[191] Zinterhofer formerly worked as a partner at

---

[189] *Id.* (alteration in original) (emphasis omitted).
[190] *Mizel*, 1999 WL 550369, at *3.
[191] Compl. ¶ 22.

Apollo Management, L.P. and Morgan Stanley Dean Witter & Co.[192] Zinterhofer is also one of three founders of Searchlight Capital Partners, LLC, a private equity firm.[193] In November 2012, a joint venture between Searchlight and Liberty Global bought a Puerto Rican cable company for approximately $585 million.[194] Searchlight owns 40% of the joint-venture entity; Liberty Global owns 60%.[195] Two years after this partnership, Liberty Global and Searchlight announced another joint venture to purchase a Puerto Rican cable company, this time for $272 million.[196] The combined business that resulted from this transaction was again a 60/40 joint venture between Liberty Global and Searchlight, and it became the largest cable company in Puerto Rico.[197] Thus, as the Complaint points out, "Zinterhofer is a current business partner with Liberty Global and Malone in corporate enterprises worth almost $1 billion."[198] As noted above, Malone owns 25% of Liberty Global's voting stock, and he chairs its board.

It is true that "[a]llegations of . . . a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's

---

[192] *Id.*
[193] *Id.* ¶¶ 22, 55.
[194] *Id.* ¶ 55.
[195] *Id.*
[196] *Id.* ¶ 56.
[197] *Id.*
[198] *Id.* ¶ 57.

independence."[199]  But it does not follow that a business relationship between a director and an interested party can never undermine the presumption of director independence.[200]  A pleading-stage inference of beholdenness may arise where the plaintiff pleads with particularity that a director's business relationship with an interested party is material to the director.[201]  Moreover, the Supreme Court has recently recognized "the importance of . . . mutually beneficial ongoing business relationship[s]."[202]  Indeed, "it is reasonable to expect that [such] . . . relationship[s] might have a material effect on the parties' ability to act adversely toward each other."[203]

In this case, Zinterhofer (through Searchlight) and Malone (through Liberty Global) are engaged in joint ventures worth almost $1 billion.  One of those joint ventures involves running the largest cable company in Puerto Rico.  It is

---

[199] *Beam*, 845 A.2d at 1050; *see also Orman v. Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002) ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence.").

[200] *See, e.g.*, *Caspian Select Credit Master Fund Ltd. v. Gohl*, 2015 WL 5718592, at *7 (Del. Ch. Sept. 28, 2015) ("As explained, Campion and Davis operate in the same line of business as Wayzata Partners, which has nominated them to numerous boards of directors. Both have engaged in various business dealings with Wayzata Partners, and expect future business relations. Wayzata Partners manages investment funds that acquire controlling interests in distressed companies. One can reasonably infer that Campion and Davis expect to be considered for directorships in companies the Wayzata funds acquire in the future. Even if the actual extent of their relationships with Wayzata Partners is not altogether clear at this point in the litigation, the existence of these interests and relationships is enough to defeat a motion to dismiss." (alterations and internal quotation marks omitted)).

[201] *See Khanna v. McMinn*, 2006 WL 1388744, at *17 (Del. Ch. May 9, 2006) ("Ultimately, the inquiry into independence turns in this instance on whether Covad's business relationship with BEA Systems was material to BEA or to Crandall himself as a director of BEA.").

[202] *Sandys v. Pincus*, 152 A.3d 124, 134 (Del. 2016).

[203] *Id.*

38

reasonable to infer that, if Zinterhofer voted to authorize a derivative suit against Malone, the relationship between Searchlight and Liberty Global might be in jeopardy. After all, "[c]ausing a lawsuit to be brought against another person is no small matter, and is the sort of thing that might plausibly endanger a relationship."[204]   True, the Complaint does not (i) compare the value of Searchlight's interest in the joint ventures to the overall value of its investment portfolio, (ii) allege the size of Zinterhofer's interest in Searchlight, or (iii) plead facts regarding Zinterhofer's net worth or compensation.  And the Complaint mentions that Zinterhofer was once a partner at Apollo and Morgan Stanley, perhaps suggesting that he is a wealthy man.  But at the pleading stage, it is reasonable to infer that joint ventures of this size are important to their principals, even if those principals have a high net worth.  It is equally reasonable to infer that joint ventures totaling almost $1 billion are material to the firms involved, even absent details regarding the size of those firms' investment portfolios.  Thus, while more information would perhaps have made the pleadings stronger, for purposes of the current Motion the Complaint adequately alleges that the possibility of endangering the Liberty Global/Searchlight joint ventures would weigh heavily on

---

[204] *Id.*

39

Zinterhofer in evaluating a demand to sue Malone.  In my view, that suffices to impugn Zinterhofer's independence at the pleading stage.[205]

* * *

Because Malone, Maffei, Nair, Rutledge, and Zinterhofer lack independence for pleading-stage purposes, at least half of the ten Charter directors who would be asked to consider a demand are conflicted.  Thus, demand is excused, and I need not consider the Plaintiff's allegations that Huseby and Jacobson lack independence for purposes of my analysis under Rule 23.1.

*C. The Complaint Pleads a Viable Claim for Breach of Fiduciary Duty*

Charter's board did not change in composition between the approval of the challenged transactions and the filing of the Complaint.  Accordingly, for the same reasons discussed in connection with the demand-futility analysis, the Charter board lacked an independent and disinterested majority at the time of the challenged transactions.  "If a board is evenly divided between compromised and non-compromised directors, then the plaintiff has succeeded in rebutting the

---

[205] *Park Employees' & Retirement Board Employees' Annuity & Benefit Fund of Chicago v. Smith*, 2017 WL 1382597 (Del. Ch. Apr. 18, 2017), is not to the contrary.  There, the plaintiff alleged that a director was beholden to an investment bank because he was the cofounder and managing partner of a firm that held a minority interest in a corporation that had received advice and underwriting services from the investment bank.  *Id.* at *8–9.  This Court held that these allegations were insufficient to impugn the director's independence.  *Id.* at *9.  Notably, unlike the Plaintiff here, the plaintiff in *Smith* did not plead any facts regarding the size of the business relationship between the director and the investment bank.  *Id.* at *8–9.

business judgment rule."[206] Once a plaintiff has rebutted the business judgment rule, "the court will review the board's decision for entire fairness,"[207] which typically precludes dismissal of a complaint under Rule 12(b)(6).[208]

Ordinarily, then, my finding of demand futility would be the end of the analysis. As this Court has recognized, "[t]he standard for pleading demand futility under Rule 23.1 is more stringent than the standard under Rule 12(b)(6), and a complaint that survives a motion to dismiss pursuant to Rule 23.1 will also survive a 12(b)(6) motion to dismiss, assuming that it otherwise . . . state[s] a cognizable claim."[209] Under the familiar Rule 12(b)(6) standard, a complaint will not be dismissed "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[210]

Nevertheless, the Defendants argue that even if demand is excused, the Complaint must be dismissed because it fails to state a claim for breach of fiduciary duty. They point out that, in accordance with Charter's certificate of incorporation, the challenged transactions were not approved by the full Charter board. Instead, they were approved by the six directors not designated by Liberty

---

[206] *Frederick Hsu Living Trust*, 2017 WL 1437308, at *26.

[207] *Id.*

[208] *See*, *e.g.*, *Orman*, 794 A.2d at 21 n.36 (noting that a finding that entire fairness applies "normally will preclude dismissal of a complaint on a Rule 12(b)(6) motion to dismiss"). The Defendants do not argue that, even if entire fairness applies, the Complaint should be dismissed because it fails to adequately allege that the challenged transactions were unfair.

[209] *Feuer v. Redstone*, 2018 WL 1870074, at *16 (Del. Ch. Apr. 19, 2018) (citation omitted).

[210] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

Broadband: Markley, Merritt, Conn, Jacobson, Zinterhofer, and Rutledge. Thus, the Defendants argue, the Complaint cannot rebut the business judgment rule unless it successfully attacks the independence of at least three of these six directors. If that is correct, the demand-futility analysis and the Rule 12(b)(6) analysis could produce different results. Suppose, for example, that Jacobson, Markley, Merritt, and Conn were deemed independent, but Malone, Maffei, Nair, Rutledge, and Zinterhofer were found to lack independence. In that case, a majority of the six directors who approved the challenged transactions would be disinterested and independent.[211] Of course, demand would be excused because the full board lacked an independent majority; but because the relevant decision-making body contained an unconflicted majority, the business judgment rule, in the Defendants' view at least, would apply.[212]

---

[211] Under 8 *Del. C.* § 141(b), "[a] majority of the total number of directors shall constitute a quorum for the transaction of business unless the certificate of incorporation or the bylaws require a greater number." Charter's certificate does not require a greater number, and thus the six directors not appointed by Liberty Broadband constituted a quorum.

[212] *See In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 995 (Del. Ch. 2007) ("[T]he directors implicated by the substantive allegations of the amended consolidated complaint are not necessarily the same as must be considered with regard to excusal of demand. Rather, the Court focuses on the directors actually alleged to be implicated in the challenged act (or failure to act)."); 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 15.05[1] (2017) ("Although useful as a rule of thumb, it may be something of an over-generalization to state that corporate self-interest is automatically created unless a majority of the corporation's directors is individually disinterested. Consider the following example: Assume six of a ten-director board have an interest in a particular transaction. If all directors are present at the meeting where the transaction is approved, it is an interested corporate transaction, since the affirmative votes of at least two interested directors are required for action. However, if only a quorum of six, including the four disinterested directors, is present and the transaction is approved with the affirmative votes of the four disinterested directors, the transaction arguably may be disinterested. . . . It may

42

The Plaintiff offers three responses to this argument. First, he argues that the Complaint successfully challenges the independence of Jacobson, Zinterhofer, and Rutledge. Thus, three of the six directors who approved the challenged transactions were conflicted. Second, according to the Plaintiff, the Defendants are actually arguing that the six directors not designated by Liberty Broadband functioned as a special committee whose approval secured business judgment rule review for the transactions at issue. The problem, says the Plaintiff, is that the Defendants have failed to meet their burden of showing the six directors in fact acted as a properly empowered special committee.

Third, the Plaintiff stresses that the Liberty Broadband designees *did* approve the acquisitions of Bright House and Time Warner, which were inextricably linked to the challenged transactions. The Plaintiff's syllogism runs as follows. The acquisitions were contingent on stockholder approval of the challenged transactions, and I have already held that this transaction structure caused the stockholder vote to be structurally coerced. Specifically, if the stockholders voted down the challenged transactions, they would lose the

thus be possible to narrow significantly the scope of interested transactions by mechanical means such as limiting the participation of interested directors in board meetings where the transaction in which they are interested is considered or delegating decision-making power over such decisions to committees of disinterested directors only."); 1 Stephen A. Radin, *The Business Judgment Rule* 819 (6th ed. 2009) ("[E]ven where a majority of a corporation's directors are interested, the business judgment rule still may govern if the challenged conduct or transaction is approved by a majority of the corporation's disinterested directors or a committee of disinterested directors.").

43

acquisitions, which both parties agree were beneficial to Charter. The six directors who approved the challenged transactions were presumably in a similar position: If they declined to recommend the allegedly unfair deals with Liberty Broadband, Charter would lose out on the opportunity to acquire Time Warner and Bright House. Thus, the Liberty Broadband designees' approval of the acquisitions led to the challenged transactions being presented to both the remaining directors and the stockholders in a structurally coercive manner. Because all ten Charter directors played a role in securing the approval of the challenged transactions, it is the full board whose independence counts for Rule 12(b)(6) purposes.

I need not reach the Plaintiff's first and second arguments, because his third argument persuades me that the independence of all ten Charter directors must be considered under the Rule 12(b)(6) analysis. The four Liberty Broadband designees did not vote on the challenged transactions. But they approved the acquisitions of Time Warner and Bright House, and the structure whereby those deals would not close unless the challenged transactions received stockholder approval. Thus, by signing off on the structurally coercive terms of the acquisitions, the Liberty Broadband designees helped "'strong-arm[]' the stockholders into voting for the [challenged] transaction[s] 'for reasons outside of

44

the economic merit' of the decision."[213]   They placed the six "independent" directors in the same "take it or leave it" circumstances.  I find, therefore, that to rebut the business judgment rule, the Plaintiff need only plead that at least half of Charter's ten directors lacked independence from Malone.[214]  Because the Plaintiff has alleged with particularity that at least five Charter directors are beholden to Malone, entire fairness applies, and the Complaint states a claim for breach of fiduciary duty.[215]

*D. The Disclosure Claim*

Finally, the Plaintiff purports to assert a disclosure claim based on allegedly misleading statements in the proxy.  According to the Plaintiff, the proxy is materially misleading because it describes Zinterhofer as "independent" without disclosing Searchlight's bias-producing business relationship with Liberty

---

[213] *Liberty Broadband Corp.*, 2017 WL 2352152, at *21 (quoting *Gradient OC Master, Ltd. v. NBC Universal, Inc.*, 930 A.2d 104, 119 (Del. Ch. July 12, 2007)).

[214] *Cf. Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 753 (Del. 2007) ("Generally speaking, a director who does not attend or participate in the board's deliberations or approval of a proposal will not be held liable. This is not an invariable rule and the result may differ where the absent director plays a role in the negotiation, structuring, or approval of the proposal." (footnote omitted)).

[215] I do not reach the question whether the business judgment rule would apply if the Liberty Broadband designees had *not* approved the acquisitions.  Moreover, to the extent the Defendants continue to maintain that entire fairness does not apply to the voting proxy agreement, I reject that argument.  Charter approved the stock issuance to Advance/Newhouse; that issuance transferred voting power to Advance/Newhouse; and Advance/Newhouse agreed to transfer some of its newly acquired voting power to Liberty Broadband.  These transactions were approved by both the six Charter directors not designated by Liberty Broadband and a majority of the stockholders.  Because at least half of Charter's directors suffered from disabling conflicts, the voting proxy—like the other challenged transactions—is subject to entire fairness review.

Global.[216]  The Complaint appears to suggest that the stockholders would not have approved the allegedly unfair transactions with Liberty Broadband if they had known of Zinterhofer's conflicts.  In other words, Charter would not have overpaid Liberty Broadband if the proxy had not been materially misleading.  In my view, the Plaintiff's disclosure claim must be dismissed.

I have already held that the Complaint states a derivative claim based on alleged corporate overpayments.  Any recovery for that claim would flow to the company, and not to the stockholders individually.[217]  Nevertheless, the Plaintiff's disclosure claim is brought directly, and, just like the derivative claim, it seeks recovery for damage done to Charter by the overpayments to Liberty Broadband.  The Supreme Court confronted a similar situation in *In re J.P. Morgan Chase & Co. Shareholder Litigation*.[218]  There, the plaintiffs brought a derivative corporate overpayment claim and a direct disclosure claim.[219]  The disclosure claim rested on the allegation that inaccuracies in the proxy statement caused stockholders to approve the overpayment.[220]  The Supreme Court affirmed this Court's dismissal of the disclosure claim to the extent it sought compensatory damages for the

---

[216] Compl. ¶ 142.
[217] *See, e.g.*, *Tooley*, 845 A.2d at 1036 ("Because a derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation.").
[218] 906 A.2d 766 (Del. 2006).
[219] *Id.* at 768.
[220] *Id.*

overpayment.[221]  Specifically, the Court held that "'compensatory damages . . .

from the [proxy] disclosure violation' are disallowed when those damages would

be 'identical to the damages that would flow to [the company] as a consequence of

. . . [the] underlying derivative [] claim.'"[222]  As the Court pointed out, the

plaintiffs' damages theory implied that "the directors of an acquiring corporation

would be liable to pay both the corporation and its shareholders the same

compensatory damages for the same injury."[223]  "That simply cannot be," said the

Court.[224]

    *J.P. Morgan* compels the dismissal of the Plaintiff's disclosure claim.  Just

like in *J.P. Morgan*, the Plaintiff in this case seeks compensatory damages for both

his derivative corporate overpayment claim and his direct disclosure claim.  And

just like in *J.P. Morgan*, the damages sought for the direct and derivative claims

are identical.  The derivative claim alleges that Charter suffered injury when it

gave Liberty Broadband corporate assets for too little value.  Likewise, the direct

claim alleges that inaccuracies in the proxy statement caused the stockholders to

approve the very same transactions, which gave away Charter assets for too little

value.  As the *J.P. Morgan* Court recognized, permitting the stockholders to

---

[221] *Id.* at 773–74.
[222] *Lenois v. Lawal*, 2017 WL 5289611, at *20 (Del. Ch. Nov. 7, 2017) (quoting *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d at 772).
[223] *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d at 773.
[224] *Id.*

47

recover individually in these circumstances would violate "the fundamental principle governing entitlement to compensatory damages, which is that the damages must be logically and reasonably related to the harm or injury for which compensation is being awarded."[225]  Thus, because the Plaintiff seeks only compensatory damages for his direct disclosure claim, that claim must be dismissed.[226]

* * *

To sum up, Counts II and IV, which rest on the premise that the Stockholder Defendants control Charter, are dismissed.  Count I, which is brought as a direct claim, is dismissed because (i) the challenged transactions give rise to purely derivative claims, and (ii) the direct disclosure claim fails.  Count III survives because the Complaint adequately alleges demand futility and pleads a viable derivative claim for breach of fiduciary duty based on the challenged transactions.

---

[225] *Id.*

[226] At oral argument, the Plaintiff's counsel expressly disclaimed any intention of seeking nominal damages.  *See* Apr. 6, 2018 Oral Arg. Tr. 49:16–17 ("MR. HEYMAN: We're not pursuing nominal damages.").  And while the Complaint generally seeks "equitable relief," Compl. at 67, a plaintiff cannot avoid the holding of *J.P. Morgan* by tacking on a makeweight request for equitable remedies in her complaint, *cf. Lenois*, 2017 WL 5289611, at *20 ("Plaintiff contends that, because he has requested rescissory instead of compensatory damages, *J.P. Morgan* does not apply. Plaintiff misses the point. . . . Were rescission reasonable and appropriate, I would undo the Transactions and put the Company back together into its previous state. That remedy seems quite obviously to belong to the Company. Rescissory damages, then, would flow to the same party, namely the Company." (footnote omitted)).

## III. CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss are granted in part and denied in part. The parties should submit an appropriate form of order.